## THE PEOPLE v. HARRY MARKS.

*Criminal law—Evidence of good character—Charge to jury.*

1. Where a respondent introduces evidence of his good character, which is not attempted to be rebutted by the prosecution, it is prejudicial error for the court to instruct the jury that, while the law permits him to make such proof, the people are prohibited from showing his bad character.

2. On the trial of a respondent for burglary with intent to commit the crime of larceny, the larceny was established. Among the stolen property was a quantity of silver coin taken from a safe ·in the store which was burglarized. It was shown that at the time of the arrest of a co-respondent, who had been tried and acquitted, a quantity of silver coin was found in the possession of his wife, which was offered in evidence, in connection with some silver coin which the owner of the stolen coin found in his store the morning after the burglary, and which the prosecution claimed came out of the safe, the only proof of identity being that *all* of the coin appeared discolored and ·blackened. The prosecution called as a witness the respondent who had been acquitted, and he testified that the money found in his wife's possession was paid to him some weeks before the burglary. The prosecution did not call the alleged payor to contradict this testimony, and the coin was received in evidence. The court gave the jury to understand from the language of his charge that the fact that the coin was discolored and blackened, and resembled that found in the store, was direct proof appearing upon the coin itself that it was a part of the stolen coin. And *it is held that, while the discoloration was a circum*stance which the jury had a right to weigh in determining the truth or falsity of the testimony of the acquitted respondent, the court had no right to direct the jury that it was direct proof that the coin came out of the safe, in the face of his uncontradicted testimony to the contrary.

Exceptions before judgment from Iosco. (Simpson, J.) Argued February 10, 1892. Decided March 11, 1892.

Respondent was convicted of burglary. Conviction set

aside, and new trial ordered. The facts are stated in the opinion.

*O. E. M'Cutcheon,* for respondent.

*A. A. Ellis,* Attorney General, and *M. J. Connine,* Prosecuting Attorney, for the people.

LONG, J. The respondent was convicted in the Iosco circuit court of breaking and entering the store of one Henry Hanson, at Baldwin, in said county, on December 24, 1890, in the night-time of said day, with intent to commit the crime of larceny.

It appeared upon the trial that Hanson's safe, kept in the store, was drilled and blown open, and about $500 in money taken. Of this money, about $100 was in silver and other coins, and the balance in paper money. The next morning after the burglary the respondent and James Mead and William Mead were arrested for the offense. Upon examination before the justice the two Meads were discharged, and, upon information given by May Mead, the wife of William Mead, and by Marietta Mead, the mother of William and James Mead, two other parties, Frank Westbrook and Robert Morrison, were arrested, charged with assisting the respondent in the commission of the offense. It is admitted in the briefs of both counsels that Morrison afterwards obtained bail, and fled, and that Westbrook was thereafter tried and acquitted. Before the time of the burglary the respondent was boarding at the house of William Mead. James and William Mead were both married, and lived in the same house, occupying separate parts, their father and mother being a part of their family. The testimony upon the part of the prosecution, which had any tendency to show the complicity of the respondent in the commission of the offense, came from the Mead family,

some of its members testifying to a confession made to them by the respondent after the burglary had been committed. This testimony was contradicted by the respondent upon his examination before the jury. The theory of the defense was that the Meads, in order to avert suspicion from James and William Mead, and to save them from prosecution, fabricated the whole story in reference to respondent's pretended confession of the offense.

The assignments of error upon which respondent's counsel relies for a reversal of the case are directed mainly to the refusal of the court to give certain requests to charge, and to the charge of the court as given. At the request of the prosecution the court charged the jury as follows:

" The respondent in this case is charged with having broken into the store of Henry Hanson with the intent to commit a felony therein, and is charged, further, with having committed the crime of larceny in said store after breaking and entering the same. If the respondent, in connection with others, formed a plan to rob this store, and if he remained on the outside and watched or stood guard for others while they broke and entered the store and committed the larceny therein, he is just as guilty of the charge as if he had been actually present in the breaking and subsequent robbery."

Respondent's counsel complains of this part of the charge, for the reason that the information did not charge the larceny to have been committed, but charged the breaking and entering with intent to commit it; and for the further reason that there was no evidence authorizing the instruction to the jury that the respondent might have been watching outside while the others were actively engaged in the work.

We think there was no error in this charge. The testimony showed that a larceny was committed by the taking away of about $500 in money, though this was not

charged in the information. The information charged the burglary, and the respondent was found guilty of that. The whole of the charge, taken together, directed the attention of the jury to the offense charged, and we cannot presume that the jury were misled by this charge, or that the jury intended to convict the respondent of the larceny, and not of his participation in breaking and entering the store. It would have been proper to have added, in the same information, a count for larceny; but there is nothing in the charge, aside from the language above quoted, which in any manner directed the attention of the jury to any claim against the respondent for the larceny, and the jury found him guilty as charged in the information.

Upon the second point it is sufficient to say that, if the testimony of the Meads is to be believed, there was some evidence to go to the jury tending to show that the respondent was watching outside while other parties were in the store engaged in the commission of the crime.

Upon the trial the respondent gave evidence by several witnesses of his good reputation in that community. The people offered no evidence in contradiction of this, and upon that question the court charged the jury, among other things, as follows:

"Hence the law says that while the people who charge a man with crime cannot establish his guilt by proving he is a man of bad character,—I say, while the law forbids the people to attack his character or bring it up in court to establish his guilt,—yet it does permit him to present his good character or his standing in life in defense."

Error is assigned upon this part of the charge, and the claim is made by respondent's counsel that this statement by the court might lead the jury to infer that the hands of the people were tied at all events, and that

this would furnish to a juror, predisposed against the respondent, a convenient answer to all argument based upon the testimony of good character.

We think there is great force in this contention. The respondent having offered evidence of good reputation, the door was open to the people to introduce evidence in contradiction of it, and to establish the fact, if they could, that the respondent's reputation for honesty was bad in that community. The people did not avail themselves of this, and presumably because no such proof could be made. The respondent, therefore, had a right to stand before the jury with this proof to be weighed in his favor. The circumstances may be such in a criminal trial that this reputation for honesty and fair dealing and an upright life may be all the defense that the accused is able to produce, and it then becomes a question for the jury to weigh such testimony, and, if it raises in their minds a reasonable doubt of the guilt of the accused, even as against strong proof made by the people, it would be their duty to acquit. When the court, therefore, told the jury that the hands of the people were tied, they might well have understood it as an instruction from the court that, though the respondent might put in proof of his good reputation, the people would not be permitted to rebut or give evidence against the respondent showing him to be a man of bad reputation. With this in mind, the jury might well say that, "had the law permitted the people to contradict this testimony, the respondent might not have stood before us with so high a character for honesty and integrity." We think this was very prejudicial to the rights of the respondent.

It was shown upon the trial that at the time that Frank Westbrook was arrested, charged with this offense, a quantity of silver coin was found in the possession of

Westbrook's wife. The coin was produced in court, and offered in evidence. It appeared discolorded and blackened. Mr. Hanson was called as a witness, and produced some coin which he found in his store the morning after the burglary. He was then asked to compare the silver taken from Frank Westbrook with that found in his store. This was objected to and excluded, the court holding that the comparison could be made by the jury. The prosecuting attorney thereupon stated:

"If there is any question about the identity of the money, I will ask the privilege of placing Westbrook on the stand."

*By the Court:* "I think there is quite a question about it; there is nothing definite about it; there is nothing in this case that is positive on the subject. If I had positive proof that that was the money that came out of the safe, I would not hesitate a moment about admitting it in evidence, but there is not positive proof in that."

The prosecution then called Frank Westbrook as a witness. He was shown the money, and asked by the prosecution:

"I call your attention to the money, the coin, and the color, and ask you if that is the money you turned over to your wife. Don't it resemble it, having the same discoloration?

"*A.* I do not think it does."

Westbrook further testified that the money which was taken from his wife by the officers was money which he gave her; that he earned some money, and loaned it to one John Hays, a saloon-keeper, and that Hays paid him back in silver; and that all this occurred several weeks before the alleged burglary. Upon this statement of facts the court charged the jury:

"There is no direct proof in this case that identifies that silver with the silver that was taken out of the safe, unless it is upon the silver itself. * * * *

If the silver is identified at all, it is by what may appear on the silver as compared with other silver taken from the safe; so that you have got to pass upon that from those facts alone."

The question was therefore left to the jury, under this charge of the court, to say that it compared with the silver taken from the safe, and found by Hanson in the store the morning after the burglary, and therefore it was presumably a part of the silver taken, notwithstanding the fact that the prosecution had called Westbrook, from whose possession it was taken, and he had testified that he had got it from Hays several weeks before the burglary was committed, and the people did not call Hays to contradict this testimony of Westbrook. From the language used by the court, the jury were given to understand that, notwithstanding the testimony of Westbrook, the silver being discolored and blackened, and resembling the money found by Hanson in the store, this was direct proof appearing upon the silver itself that it was a part of the money taken from Hanson's safe.

The court was in error in this. While it is true that the prosecution would not necessarily be bound by Westbrook's testimony if it had been contradicted, yet, as the testimony stood uncontradicted, it tended to show that this could not have been the money taken from the safe, as Westbrook had it in his possession long before the time of the burglary. The discoloration was a circumstance which the jury had a right to weigh in determining the truth or falsity of Westbrook's testimony, but the court had no right to direct the jury that it was direct proof that the money came out of the safe, and this, in the face of the testimony of Westbrook, which the people in no way, even by the calling of Hays, sought to impeach or contradict.

Some contention is made that the court was in error

in his instruction to the jury in the definition given to the term "reasonable doubt." We do not think it necessary to discuss this part of the case, as, upon another trial, the trial court will undoubtedly follow the definition given by this Court in several cases heretofore published.

It is also contended that the defendant's theory was not given to the jury, as the court refused to give the requests to charge upon that subject. As before stated, the theory of the defense was that the Meads. were the guilty parties, and that they conspired to charge the respondent with the crime, and thereby escape prosecution themselves. There was testimony upon the trial showing that one of the Meads procured from a store a piece of fuse, and, after arrest, made the claim that the Mead brothers were not ready to go on with the examination until they could procure the party for whom the fuse was purchased, a farmer living some distance away. On the trial of the respondent, William Mead testified that he purchased this identical piece of fuse for respondent. Many other circumstances were claimed to have been shown which the defense claims strengthened the theory that the job was put up on the respondent by the Meads, and this is the theory which he asked the court to submit to the jury. We think the court should have stated to the jury the circumstances and the claim made by the respondent.

For the errors pointed out the verdict must be reversed, and a new trial ordered.

MORSE, C. J., and McGRATH J., concurred with LONG, J. GRANT and MONTGOMERY, JJ., concurred in the result.